**ADAMS LABORATORIES, INC.,**
Plaintiff-Appellee,
Cross-Appellant,

v.

**JACOBS ENGINEERING CO., INC.,**
Defendant-Appellant,
Cross-Appellee.

Nos. 83–2857, 83–2932.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 3, 1984.

Decided May 7, 1985.

As Amended May 13, 1985.

See also, 486 F.Supp. 383.

Howard Blum, Cantor & Reiss, New York City, for plaintiff-appellee, cross-appellant.

Thomas D. Allen, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellant, cross-appellee.

Before BAUER, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

This is an appeal of a jury verdict assessing $1,996,694 in damages against the defendant, Jacobs Engineering Company ("Jacobs") for negligence, negligent misrepresentation and breach of contract in the design and construction of a chemical plant built for the plaintiff, Adams Laboratories ("Adams"). We remand this case for a new trial because of the numerous errors that occurred, including prejudicial comments made during the course of the trial.

## I.

Adams is in the business of producing nutritional supplements for animal feed. In January of 1971, Adams contacted Jacobs concerning the design and construction of a chemical plant to be built in Coal City, Illinois to produce fatty acids from waste oils. The record reveals that Jacobs conducted a feasibility study and found that the production of fatty acids from waste oils was not practical. Jacobs then allegedly submitted plans to Adams for the construction of a plant to produce fatty acids from raw vegetable soap stocks. At the time Adams expressed concern to Jacobs about the possibility that the "acid water" resulting from this process might be very easily classified as an illegal pollutant. Adams claims that it decided to go forward with the project only because it received assurances from Jacobs that the pollution problem would be solved.

The parties entered into contract negotiations for construction of the new plant in 1973 and agreed upon a contract in the summer of 1975. The contract provided that Adams would supply all necessary permits for completion of the plant and Jacobs would exercise its "best efforts" in designing the plant to operate in compliance with the environmental laws.[1] The contract also guaranteed that the plant would meet certain performance specifications; however, the contract excluded Jacobs from any liability for consequential damages including "damages for loss of product, operating cost and plant downtime." The parties also agreed to a guaranteed maximum price for the plant ($1,365,000) with Jacobs absorbing any construction cost overruns for the project.[2]

At trial, Adams contended that prior to and during the period of the contract negotiations, Jacobs made several representations to Adams extolling its expertise in the design and construction of chemical plants, such as the one to be built for Adams. According to the evidence introduced at trial, Jacobs reassured Adams that it could solve the pollution problem through the use of a glycerin recovery plant. Specifically, several of the representations concerned brochures given to Adams detailing Jacobs' years of experience in constructing fatty

---

1. In 1972, during a subsequent investigation at the proposed plant site, a Jacobs vice president in charge of the project allegedly became aware that Illinois and federal Environmental Protection Act ("EPA") requirements needed to be met but never contacted the EPA on this matter.

2. Adams also contracted with Pennwalt Corporation, a firm with expertise in building machinery to convert raw soapstock to fatty acids, to provide the necessary equipment. Prior to trial, Adams and Pennwalt agreed to settle any possible claims of Adams against Pennwalt for $10,000.

acids and glycerin recovery plants and statements made by Jacobs' representatives to local governmental zoning authorities regarding its ability to provide the engineering "know how" in designing a plant that was capable of eliminating the illegal pollutants.[3] Jacobs attempted to rebut this evidence by pointing out that Dr. Garrett, founder and part owner of Adams, had obtained a patent for combining the fatty acid conversion and glycerin production processes. Thus, with the evidence of Garrett's application for a patent on fatty acid and glycerin production process, Jacobs sought to establish that it was really Dr. Garrett's and not Jacobs' idea to build a plant that could produce both fatty acids and glycerin.

The parties also disputed the type of plant to be provided by Jacobs. At trial, Adams contended that the contract called for the work to be completed on a "turnkey" basis,[4] while Jacobs denied that the contract specified an almost perfect plant. Nevertheless, the plant opened in 1974 and failed to produce the agreed upon quantities of fatty acid and glycerin.[5] Adams contended that the plant's inability to perform up to expectations was due to Jacobs' negligence in designing the fatty acid and glycerin recovery process.[6] In 1975, it was also discovered that the EPA permit was never obtained and that the cost, according to the plaintiff's expert, in adapting the plant to resolve the EPA compliance problems would be in excess of $1,700,000. Jacobs responded that the failure of the plant to comply with the amount specified in the contract was due to Adams substituting substandard raw soapstock in the process. It further argued that under the terms of the contract it was Adams' responsibility to

obtain the necessary permits and that it had used its "best efforts" to design the plant to comply with environmental laws since the final byproduct in the process was to be distilled water. Adams contended that it was unable to operate the plant profitably and eventually was forced to abandon the plant, selling it for $175,000.

During opening arguments at trial, Adams violated an earlier district court order prohibiting any mention of Adams financial plight and told the jury that Jacobs had forced Adams into bankruptcy. Adams also violated another pretrial order in its opening argument in mentioning the fact that it was seeking punitive damages. During the trial and in particular during its closing argument, Adams sought to portray Adams as a small company with little wealth in comparison to the stature and wealth that Jacobs enjoyed in the industry. Furthermore, the district court ordered Adams to submit a copy of the contract to the jury for use during its deliberations after excising from the contract any reference to the various insurance provisions, but Adams failed to comply with this order and submitted the contract to the jury without any deletions.

At the close of trial, the district court judge submitted negligence, negligent misrepresentation, breach of contract, and comparative negligence verdict forms to the jury. The jury returned a verdict for Adams on the negligence count but reduced Adams' award by 25 percent, finding that Adams had been comparatively negligent. The jury made no entry on the verdict forms dealing with the negligent misrepresentation or breach of contract claims. In an effort to clarify and determine the jury's intention, the district court asked the

---

3. For example, an attorney for the then owner of the land, which was considered to be the primary plant site, testified at trial that he had been told by a Jacobs representative that there would be no pollution problems with the plant. He testified to this fact, along with a Jacobs' representative, before the Coal City, Illinois zoning board.

4. A "turnkey" is a term used in the construction industry which means that a contractor agrees

to provide a facility where the purchaser need only "turn the key and start it up."

5. The contract specified that at least 8,000 pounds of fatty acids, 18,560 pounds of neutralized glycerin water, and 1,098 pounds of crude glycerin per hour be produced.

6. Adams claimed that faulty filters, evaporators and mixing equipment designed and installed by Jacobs caused the breakdown in the process.

jury foreman whether it was the jury's intention to find for Adams on the negligence count only. The foreman answering for the panel advised the court that this was the jury's intention and a verdict for Adams was entered on the negligence count only. Adams' counsel immediately requested that the court poll the entire jury panel. The district court did and after listening to the individual juror's response to the court's question of whether the verdict was meant to "cover all the claims," reversed its earlier ruling, determining that the jury intended to find for Adams on all three counts, negligence, negligent misrepresentation and breach of contract. Thereafter, the district court entered judgment against Jacobs on all three claims.

On appeal, Jacobs claims that the prejudicial comments made by Adams' counsel during opening and closing argument, as well as numerous other trial errors, require a new trial. Several of the alleged errors include the entry of judgment on the breach of contract and negligent misrepresentation counts, the submission of the negligence and negligent misrepresentation claims to the jury, and alleged inadequate jury instructions on the liability and damage claims. Because of the lack of clarity and the confusing nature of the questions asked of the jurors, as well as the prejudicial statements made by Adams' counsel at trial, we remand this case for a new trial on all issues.

## II.

We initially address Jacobs' claim that the district court erred in entering judgment against Jacobs on the breach of contract and negligent misrepresentation claims. The record reveals that the jury returned a verdict for Adams on the negligence claim, but made no determination and left unanswered the verdict forms for the negligent misrepresentation and breach of contract claims. The district court, in an effort to clarify the verdict, asked the jury foreman:

"THE COURT: Was it the intention of the jury in rendering their verdict to render a verdict that covers all the claims of the plaintiff against the defendant?

"FOREPERSON AGREGADO: No, not all the claims.

"THE COURT: Just the one claim?

"FOREPERSON AGREGADO: We take out some of the claims of the plaintiff, and we awarded the defendant one hundred seven thousand for the debt of the defendant to the plaintiff.

"THE COURT: Yes.

"There were claims of the plaintiff against the defendant with relation to what he called misrepresentation, there were claims against the defendant of what were called negligence, and there were claims against the defendant of what were called breach of contract. Was it your intention that your verdict stand for all of those claims?

"FOREPERSON AGREGADO: We decided to—the whole jury decided to find the defendant guilty on negligence.

"THE COURT: And not on the other counts?

"FOREPERSON AGREGADO: No, no other counts.

"THE COURT: Very well, Then the presumption is correct."

Pursuant to Adams' request, the district court then polled the jury panel asking the following question:

"[W]as it your intention that the verdict you rendered *cover all the claims* of the plaintiff against the defendant, as well as the one counterclaim of the defendant against the plaintiff?" (emphasis added).

Each and every jury member answered "yes." The district court then entered judgment against Jacobs on each of Adams' three claims. Jacobs contends that the entry of verdict was improper since the question asked the jury was ambiguous and, thus, the district court denied Jacobs its right to trial by jury on the breach of contract and negligent misrepresentation claims when it entered judgment against Jacobs on these issues. We agree.

■ Polling of a jury after the rendering of its decision is allowed in order to protect against any possible ambiguity in the verdict. *See, e.g., United States v. Mears*, 614 F.2d 1175, 1179 (8th Cir.), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980); *United States v. Duke*, 527 F.2d 386, 394 (5th Cir.1976); *Curry v. Moore-McCormack Lines, Inc.*, 51 F.R.D. 301, 303 (S.D.N.Y.1970). Polling a jury is certainly proper when the verdict is unclear; however, in all cases any amendment of the verdict must reflect the real intent of the jury. *See, e.g., Roadruck v. Schultz*, 333 Ill.App. 476, 77 N.E.2d 874, 882 (1948).

■ Given the lack of clarity and specificity of the question asked by the district court, i.e., whether their verdict was intended to "cover all claims," we are unable to determine just what the jury panel intended when it answered the question in the affirmative. Initially, the jury foreman, in response to a question from the district court, stated that the jury intended to find the defendant liable for negligence only. Adams' attorney then requested that the court poll the jury. Rather than being asked whether they (the jury) meant to find for Adams on the negligent misrepresentation and contract claims, the jury was asked whether their verdict was intended to "cover all the claims against the defendants ..." and thus the question was framed in such a manner that it is impossible, from our vantage point, to determine whether the jury meant to find for or against Jacobs on the other claims. The court should have asked each juror individual questions addressing each claim of negligence, negligent misrepresentation and

breach of contract. However, from the answers given to the district court's single, ambiguous question, it can be persuasively argued that the jurors intended to find for Adams on the negligence claim only and thus the verdict "covered" all of Adams' claims.[7] Indeed, as noted by the district court in its post-trial memorandum denying the defendant's motion for judgment n.o.v., the question using the term "cover" was confusing. Further, the jury foreman's response to the district court's initial question as to the scope of their verdict (i.e., "we take out some of the claims of the plaintiff ...") seemed to indicate that he believed the district court to be inquiring about Adams' damage and not its liability claims. Other jury members may also have been similarly confused and believed that their answer to the district court's inquiry concerning whether their verdict "covered all of the claims" against the defendant, related to Adams' damage claims (i.e., amounts claimed less the set-off for comparative negligence) and not to its liability claims. The question asked the jurors was unclear and ambiguous, such that it is impossible to discern the jury's true intent from their answers. Therefore, because of the ambiguous question presented to the jurors, we hold that entry of judgment against Jacobs on the negligent misrepresentation and breach of contract claims was inappropriate, and when considered with the other prejudicial occurrences at trial, to be discussed later in this opinion, a new trial is required.

This case is premised upon diversity jurisdiction and the parties agree that the law of Illinois applies. Adams contends that even if it was improper for the district

---

7. From our review of the record in this case, we can not state that the evidence in this case would clearly support a jury finding of negligent misrepresentation or breach of contract such that the verdict could be supported despite the ambiguous question asked the jurors. Jacobs presented evidence that Dr. Garrett, the founder of Adams and a renowned chemist, actually filed a patent on combining the fatty acids and glycerin recovery processes. Thus, Jacobs legitimately argued that Adams did not rely on any representations made by Jacobs.

Jacobs also argued that since Adams signed the construction contract in the summer of 1975, well after Adams had been notified of the problems with the plant, Adams had waived any right to assert any alleged breach of contract claim. *See, e.g., Mayer Paving & Asphalt Co. v. C.A. Morse, Inc.*, 48 Ill.App.3d 73, 8 Ill.Dec. 122, 365 N.E.2d 360, 365 (1977). Further, Jacobs argued Adams had not lived up to its end of the contract since it had used substandard raw soapstock in the process.

court to enter judgment against Jacobs on the other two claims, the verdict should still be affirmed since submission of the negligence claim was proper under Illinois law. In this case, Adams contracted with Jacobs, a professional engineering firm, to design and construct its plant. Adams asserts that this case, in effect, is a design malpractice action and thus it falls within those Illinois cases allowing for recovery of economic loss caused by the negligence of a professional. *See, e.g., Sheetz v. Morgan*, 98 Ill.App.3d 794, 54 Ill.Dec. 117, 424 N.E.2d 867 (2nd Dist.1981) (attorney); *Christison v. Jones*, 83 Ill.App.3d 334, 39 Ill.Dec. 560, 405 N.E.2d 8 (3d Dist.1980) (attorney); *Maxfield v. Simmons*, 96 Ill.2d 110, 70 Ill.Dec. 236, 238, 449 N.E.2d 110, 112 (1983). In the alternative, Adams contends that Jacobs' negligence caused property damage and, thus, recovery under a negligence theory is proper.

At trial, Adams relied on *Bates & Rogers Construction Corp. v. North Shore Sanitary District*, 92 Ill.App.3d 90, 47 Ill.Dec. 158, 414 N.E.2d 1274 (2nd Dist.1980) (*"Bates I"*) to convince the district court that it was proper to submit a negligence claim to the jury where economic loss is sought as damages. In *Bates I*, the Illinois Appellate Court held that the plaintiff stated a cause of action where it sought economic damages against the defendant-engineers for the negligent design of equipment used in a sewage treatment facility. *Id.* 47 Ill.Dec. at 163–65, 414 N.E.2d at 1279–81. In 1982, the Illinois Supreme Court ruled that a recovery for economic loss in tort would not be allowed where the economic loss resulted from the disappointed commercial expectation of the plaintiff. *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 753–55, 435 N.E.2d 443, 450–52 (1982).[8] Essentially, *Moorman* held that since the Illinois law of sales had been developed to govern the economic relations between suppliers and consumers of goods, any economic loss incurred from these transactions should be governed by the law of contract and not the law of tort. *Id.* In view of the Illinois Supreme Court's decision in *Moorman*, Jacobs argues that since Adams claims economic loss resulting from its alleged negligence in designing and constructing the plant, *Moorman* bars recovery. In *Moorman*, the complaint alleged that a crack that developed in a grain storage tank was due to the defendant's negligent design and construction of the tank. Thus, Jacobs argues that if *Moorman* barred a negligence action where design defects were, in part, alleged to have caused economic loss, *Moorman* must necessarily bar Adams' negligence action in this case since Adams claimed the plant was negligently designed, engineered and constructed.[9]

We note that the issue of recovery of economic loss in a negligence action against a design professional is far from clear in the state of Illinois.[10] The *Moorman* decision has been read broadly to bar such actions where the design professional is in direct privity with the plaintiff. *See Palatine National Bank v. Charles W. Greengard Associates, Inc.*, 119 Ill.App.3d 376, 74 Ill.Dec. 914, 456 N.E.2d 635 (2d Dist.1983). Contrary authority can also be found declining to extend the *Moorman* doctrine to persons providing professional design services, even though those persons were in privity of contract with the plaintiff. *See Rosos Litho. Supply Corp. v. Hansen*, 123 Ill.App.3d 290, 78 Ill.Dec. 447,

---

**8.** Moorman defined economic loss as "damages for inadequate value, cost of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . ." *Moorman*, 61 Ill.Dec. at 752, 435 N.E.2d at 449.

**9.** The Illinois Supreme Court made clear in *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982), *Moorman* is not limited to cases where a product is involved. In

*Redarowicz*, the Illinois Supreme Court barred a homeowner's claim against the builder of the home for economic loss caused by the builder's alleged negligence in constructing the house.

**10.** Compare Bertschy, *The Economic Loss Doctrine in Illinois after Moorman*, Ill. B.J. 346, 352–54 (Feb.1983) *with* Stein, Cottrell, & Friedlander, *A Blueprint for the Duties and Liabilities of Design Professionals After Moorman*, 60 Chi.[–]Kent L.Rev. 163 (1984).

462 N.E.2d 566 (1st Dist.1984) (limiting *Moorman* to situations in which a product or good is involved where the UCC provides protection to plaintiff with its implied warranties). Other Illinois Appellate Court cases have arrived at different conclusions in determining whether the *Moorman* decision bars recovery in negligence against the design professional for economic loss. *Compare Bates & Rogers Const. Corp. v. North Shore Sanitary Dist.*, 128 Ill.App.3d 962, 84 Ill.Dec. 149, 471 N.E.2d 915 (1984) (*"Bates II"*) (negligence claim for economic loss inappropriate) *with Ferentchak v. Village of Frankfort*, 121 Ill.App.3d 599, 76 Ill.Dec. 950, 459 N.E.2d 1085 (3d Dist.1984) (negligence claim appropriate where there is no breach of contract action available). In *Bates II* and *Ferentchak* privity of contract did not exist between the plaintiff and the defendant/design professional. The Illinois Supreme Court recently rendered its decision in the *Ferentchak* case and reversed the appellate court. The two issues presented to the Illinois Supreme Court were: (1) whether a duty existed under the facts of that particular case to sustain an action in negligence and (2) whether *Moorman* barred recovery for economic loss sustained as a result of the alleged negligence of a design professional. *See Ferentchak v. Village of Frankfort*, 105 Ill.2d 474, 86 Ill.Dec. 443, 475 N.E.2d 822 (1985). The Illinois Supreme Court concluded that the design professional (who was not in privity with the plaintiff) did not owe a duty to the plaintiff since the contract (with the third-party) failed to expressly provide for such a duty. As to the defendant's argument "that those cases [*Moorman*, etc.] bar the plaintiff's action in tort because they seek damages for 'economic loss,'" the Court noted "[b]ecause of our

resolution of the duty requirement, however, it is unnecessary to review the appellate court's resolution of this contention." We need not reach the issue of whether Adams' negligence claim remains viable after *Moorman* because the prejudicial remarks of counsel require reversal and remand for a new trial. On remand the respective attorneys and the district court should examine the recent Illinois cases to determine whether or not the negligence claim remains viable in this case.[11]

We turn to the prejudicial errors committed at trial. Prior to trial, the district court judge, granted Jacobs' motion *in limine* barring Adams from making any reference to its voluntary bankruptcy proceedings. In direct contravention of this order, Adams' counsel made the following comments during opening argument:

> "Now, if I were to be asked in general to try to sum up what this case is all about, I would be saying to you that this case is a situation in which plaintiff intends to prove it was *forced into bankruptcy* because it engaged in activities with the defendant and it relied upon statements made by the defendant which proved to be false, and as a result of that reliance in going forth with the particular project which failed entirely the plaintiff was *forced into bankruptcy* and all the occurrences thereof."[12] (emphasis added)

After Jacobs registered its objection, the district court instructed the jury that bankruptcy was not an issue in this case. Adams' counsel also mentioned during its opening argument that the plaintiff would be seeking punitive damages. This statement also directly violated a district court order that no mention of punitive damages be made until Adams had established a

---

**11.** Adams argued, in the alternative, that since *Moorman* noted that a negligence claim is proper where a party had suffered property damage, it was proper to submit the negligence claim to the jury in this case since Adams suffered a loss of raw soapstock in the process. However, because of other errors to be discussed next, we need not address the issue of whether this loss

should be considered property damage or merely whether it related solely to Adams' disappointed commercial expectations.

**12.** During *voir dire* one of the jurors disclosed that her impartiality may be swayed by an event which "would affect one company or the other

*prima facie* case of fraud.[13] In addition, Adams referred to Jacobs' present wealth during questioning of one of Jacobs' executives,[14] and referred to the enormous size of Jacobs as compared to Adams during closing argument:

> "Now, you have heard us, and you know that the plaintiff in this case is Adams, *a small corporation*, which was severely affected by that Coal City project.... And, of course, I might say to you, by the same token that even though we are dealing with Jacobs Engineering, you have never seen Dr. Jacobs here, because *Dr. Jacobs is the head of a massive organization dealing with hundreds of millions of dollars.* And that is not to say, by the way, that he does not have an interest in this case. That would not be a fair statement. Nor does it say, so that I may make myself clear to you, that because you are dealing with *one large corporation* and you are dealing with *one small corporation*—

Jacobs objected to this remark and the district court asked Adams to use the term "relatively" when describing the parties. Adams then continued:

> "All right, then, if you say—while we are talking about a relatively large corporation and a relatively small corporation, I do not want you to find on the basis of one corporation being relatively smaller. That's not what I'm asking. I'm not asking you to make a decision based upon the fact that one corporation may be larger in size or have more assets than the other corporation." (Tr. Vol. XXVI at 120–121).

Finally, Adams disobeyed a district court order that it redact the portion of the construction contract referring to the insurance provision before submitting that exhibit to the jury for use during deliberations.[15]

We initially address Adams' alleged violation of the district court order prohibiting any reference to bankruptcy. Adams argues that Jacobs raised the bankruptcy issue when it submitted into evidence several bankruptcy documents. Prior to trial, the district court granted Jacobs' motion *in*

---

as far as, or that cause them to close, or something like that."

**13.** On February 2, 1983, the district court entered an order from the bench prohibiting the plaintiff from mentioning the fact that it was seeking punitive damages. Tr. Vol. I at 27–28. The court ruled that it would hear evidence concerning liability from both Adams and Jacobs and then decide, prior to the presentation of evidence on damages, whether it would allow Adams to present evidence of Jacobs' wealth in regard to the fraud claim. *See* Tr.Vol. X at 2–3. The district court ruled, after all the evidence had been submitted on the issue of liability, that there was insufficient evidence to submit the issue of fraud to the jury.

**14.** "THE WITNESS: Jacobs Engineering Group is made up of several offices of engineers, designers, accountants, estimators, purchasers.
"We provide services—engineering, design and construction—to the process industries.
"MR. REISS: In actuality, you are talking about a business which has sales of approximately $400,000,000 a year, are you not?
"THE COURT: Is that material?
"MR. REISS: Well, I think it is to form a basis of the nature of the business. We have been talking about the fact that Jacobs Engineering has a large organization, and what that large organization is.
"MR. ALLEN: Your Honor, this is designed only to prejudice the jury.
"THE COURT: Well, I fail to see any other use for it at this time other than to indicate that the defendant is a very large and wealthy organization and that the plaintiff is poor. If the jury is going to decide the case between equals, then the size of it doesn't matter."
This characterization of Jacobs in terms of its total present sales certainly appeared to be designed to place in the minds of the jurors the wealth of the defendant Jacobs, and may have violated the district court's order that only the issue of liability was to be addressed during this phase of the trial; the latter phase to be devoted to damages after the district court had decided whether sufficient evidence existed to submit the fraud claim to the jury. *See supra,* note 13.

**15.** Though Jacobs was not insured for claims arising from the non-performance of the plant, insurance provisions within the contract could have been construed by the jury as providing such coverage. For example, in Section 8.1(c) the contract provided that Jacobs maintain insurance of up to two million dollars in "Builders' All-Risk Insurance." The jury's verdict, ironically, was for just less than two million dollars.

*limine* and ordered Adams not to raise its bankruptcy problems unless the subject was first raised by Jacobs. The order also recognized that Jacobs could use certain exhibits at trial, to which Adams now refers, in case bankruptcy did become an issue, but Jacobs was not bound by the order to submit any of these documents. While the district court order recognized that Jacobs could submit the documents into evidence if the issue of bankruptcy did arise, Jacobs never submitted the documents at trial. Thus, Adams' argument that Jacobs raised the issue first is a misrepresentation of the record.

■ Adams also argues that Jacobs raised the bankruptcy issue when Jacobs' attorney informed the jury during *voir dire* that Jacobs was counterclaiming for an amount due on a note issued to Adams. Adams stated at trial, during a side bar conference, that one of its defenses at trial would be that this note was discharged in an earlier voluntarily bankruptcy proceeding. If in fact this was its defense, it does not justify the remark that, in effect, Jacobs forced Adams into bankruptcy.[16] The reason for the district court order was that any such reference to the bankruptcy would be extremely prejudicial and it would force the parties to concern themselves with matters collateral to the issues at trial. We agree with this reasoning. Where the financial viability of the plaintiff is not an issue at trial, informing the jury during opening argument that the plaintiff is bankrupt due to the actions of the defendant is the type of unnecessary, inflammatory rhetoric that very easily could bias the jury's view of the case from the outset.

Thus we hold that Adams' reference to the bankruptcy, in direct contravention of the district court order, constitutes prejudicial error.

■ Likewise, Adams' reference to the comparative size and financial wealth of Jacobs and Adams was improper. "Courts have held that appealing to the sympathy of jurors through references to the relative wealth of the defendants in contrast to the relative poverty of the plaintiffs is improper and may be cause for reversal. *See, e.g., Draper v. Airco, Inc.,* 580 F.2d 91 (3d Cir.1978); *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir.1975).[17] If the wealth and size of a corporation are not at issue, counsel is bound to refrain from making reference to such size and wealth, or bear the risk of an unfavorable appellate reception."

■ Finally, since the issue of insurance had nothing to do with the issues presented at the trial, the district court ordered Adams to redact the insurance provision contained in the contract with Jacobs before submitting that exhibit to the jury for their consideration; however, it was later discovered that the insurance provisions were not removed. Thus, the jury had an unredacted copy of the contract available to them during their deliberations. Adams contends that Jacobs was not prejudiced at all since Jacobs' own exhibits of the contract included the insurance provisions. However, these contracts were not given to the jury during the trial or during deliberations. We are aware that to constitute reversible error, references to insurance coverage must be "due to some misconduct

---

16. In fact, the bankruptcy judge handling the earlier bankruptcy proceeding made no mention that Adams' solvency problems were caused by the Coal City Project. *See In Re Adams Laboratories, Inc.,* 3 B.R. 503, 515 (Bkrtcy.E.D. Va.1980).

17. *See also, Gonzalez v. Volvo of America Corp.,* 734 F.2d 1221 (7th Cir.1984), *vacated in part,* 752 F.2d 295, 298 (7th Cir.1985) (counsel's failure to make a contemporaneous objection to prejudicial remarks waives the issue). Although the comments made in this trial might not be considered as grave as those made in *Gonzalez* (there the plaintiff characterized the parties as the "corporate giant against the innocent consumers"), taken together with the statement that Adams was forced into bankruptcy and the questions surrounding the insurance coverage provisions, Jacobs' defense was unduly prejudiced.

or improper remarks or questions of counsel, ofttimes repeated, and calculated to influence or prejudice the jury." *Kitsch v. Goode*, 48 Ill.App.3d 260, 6 Ill.Dec. 17, 362 N.E.2d 446, 451–52 (1977). There is insufficient evidence in the record to hold that submitting the insurance coverage provisions to the jury was intentional or designed to prejudice Jacobs' case. Further, Adams contends, and the record discloses, that Jacobs' counsel was given an opportunity to review the plaintiff's exhibits before they were submitted to the jury, although Jacobs argued to the district court it did not examine the documents thoroughly since it was relying on the district court order that all insurance references be deleted. Jacobs' proffered excuse is unpersuasive since it is also their attorneys responsibility to thoroughly examine all exhibits before they are submitted to the jury.

Thus, while the jury's consideration of the insurance provisions is not reversible error in and of itself, when considered along with the other statements made by Adams' counsel, we agree with Jacobs that a new trial is required as the cumulative effect of these occurrences when viewed in the context of the entire trial unduly prejudiced Jacobs' defense.[18]

### III.

Because of the confusion surrounding the jury's verdict and the prejudicial statements made by Adams during the trial, we reverse and remand this case back to the district court for a new trial on all issues. Circuit Rule 18 shall apply on remand of this case.

---

18. Jacobs alleges other errors concerning the submission of the negligent misrepresentation claim and the adequacy of the liability and damage jury instructions. Finding prejudicial error in the comments of counsel, we do not reach these alleged errors. We do note, however, that the parties should brief and submit to the district court the issue of whether negligent misrepresentation remains a viable claim under the facts of this case. Further, the district court should closely examine Adams' damage claim under the heading of "Cost in Excess of Guaran-

teed Maximum Price" to determine if those costs are barred by the limitation on consequential damages contained in the contract.

