REPUBLIC STEEL CORPORATION, Plaintiff-Appellant,

v.

PENNSYLVANIA ENGINEERING COR-PORATION, Defendant-Appellee.

No. 84–3088.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1985.

Decided Feb. 28, 1986.

Daniel J. Leahy, Leahy & Eisenberg, Ltd., Chicago, Ill., for plaintiff-appellant.

Lawrence C. Begun, Jenner & Block, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and WRIGHT, Senior Circuit Judge.*

ESCHBACH, Circuit Judge.

The primary questions presented in this appeal governed by Illinois law are (1) whether an agreement for the design, sale, and assembly of two steel furnaces is a contract for the sale of goods within the meaning of the Illinois Uniform Commercial Code ("U.C.C."), and thus subject to the limitations period of the U.C.C., and (2) whether a plaintiff may recover damages in tort for repair costs and loss of profits arising out of the negligent performance of engineering, design, and purchase agency services in connection with the sale and installation of the two furnaces. The district court entered judgment on the pleadings under Fed.R.Civ.P. 12(c) in favor of the defendant on the contract claims, and granted the defendant's motion under Fed. R.Civ.P. 12(b)(6) to dismiss the product-liability and negligence claims. For the reasons stated below, we will affirm.

I

On August 1, 1974, Republic Steel Corporation ("Republic"), a New Jersey corporation with its principal place of business in Ohio, entered into an agreement, entitled "Engineering Services Equipment Supply Agreement" ("Agreement"), with Pennsylvania Engineering Corporation ("PEC"), a Delaware corporation with its principal place of business in Pennsylvania, in connection with the design, manufacture, and installation of two steel furnaces for use in Republic's Chicago-district plant. Republic and PEC also executed a series of "placement recommendations" that authorized PEC to purchase or supply, as Republic's agent, some of the component parts necessary for the assembly and installation of the furnaces.

The Agreement contained numerous provisions defining PEC's responsibility in providing engineering, design, startup, and training services. Articles 3 and 4 of the Agreement set forth the fees payable to PEC, making specific allocations as to the item or service for which remuneration was to be made. The Agreement also contained numerous warranty and liability provisions.[1]

The facility installed at Republic's plant included the two furnaces. Propelled by four electric motors attached to mechanical drive assemblies, the furnaces could be tilted and rotated 360 degrees. Variable voltage panels, located apart from the mechanical drive units, controlled the furnace drive assemblies. When properly functioning, the variable voltage units decelerated the furnace drives at a uniform and controlled rate.

After acceptance by Republic's special certification team, Furnace No. 1 and Furnace No. 2 began operation on March 10, 1977, and on December 3, 1977, respectively. In September of 1980, the mechanical drive for Furnace No. 2 failed due to fatigue. The failure did not result in any personal injury. Republic's examination of the drive for Furnace No. 1 showed it to be in a state of imminent failure.

On September 27, 1982, Republic filed suit against PEC and others seeking $2.6 million in repair costs and loss of profits.

---

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. *See infra,* textual discussion of tort claims at 182–183.

Count I of Republic's complaint asserted a breach of contract claim against PEC. In Count II, Republic claimed that PEC had breached an implied warranty that the furnaces were "of a good and merchantible [sic] quality pursuant to the applicable provisions of the Uniform Commercial Code." In Counts III, IV, and V, Republic asserted products-liability and negligence claims against PEC. Republic alleged that the drive failures resulted from excessive stress to the furnace drive assemblies caused by a bypass of the deceleration mechanism. The deceleration bypass, Republic alleged, was due to a mis-wiring of the variable voltage control panels at the time of original manufacture. Republic alleged that PEC was responsible for preparing the necessary specifications and drawings for the control units, for requesting and analyzing quotations from suppliers, and for advising Republic on the ultimate purchase. Republic alleged further that, subsequent to the purchase of the drive control units, PEC was responsible for field supervision, check-out, start-up, and operator training.

On January 13, 1984, the district court granted PEC's motion under Fed.R.Civ.P. 12(b)(6), and dismissed Republic's tort claims. The district court held that, under the rule of *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill. Dec. 746, 435 N.E.2d 443 (1982), economic losses are not recoverable in tort for damages resulting from a qualitative defect in a product, and hence, that Republic must seek its relief in an action on the Agreement.

On October 19, 1984, the district court held that Republic's contract claims were time-barred by the four-year limitations period in § 2–725(1) of the U.C.C., and entered judgment on the pleadings in favor of PEC. The district court reasoned that, because the services PEC rendered were incidental to the sale of the furnaces, the agreement between Republic and PEC must be treated as a contract for the sale of goods governed by the U.C.C. The court found that the complaint had been filed over four and one-half years after PEC had delivered and installed the furnaces. Republic appeals from the district court's orders of January 13 and October 19, 1984.

## II

Republic advances two arguments on appeal: (1) the four-year limitations period contained in § 2–725 of the U.C.C. does not apply to its claim that PEC breached the Agreement, for that agreement is one for the rendition of services, not the sale of goods; and (2) the Illinois Supreme Court's decision in *Moorman* does not bar Republic's tort claims against PEC for the negligent performance of engineering and consulting services. We disagree with both arguments.

### A. Statute of Limitations

Before discussing the substance of its contract claims, we address Republic's challenge to the scope of the record on appeal. The district court granted PEC's motion under Fed.R.Civ.P. 12(c) for judgment on the pleadings as to Republic's contract claims.[2] Under Rule 12(c), the record

**2.** Fed.R.Civ.P. 12(c) provides:

Motion for Judgment on the Pleadings. After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

Like the summary judgment procedure, a motion under Rule 12(c) is directed towards a final judgment on the merits. *Flora v. Home Federal Savings & Loan Ass'n*, 685 F.2d 209, 211 (7th Cir.1982). For the purpose of PEC's 12(c) motion, the district court was required to accept as true all facts alleged in Republic's complaint. *See, e.g., Flora*, 685 F.2d at 211; *M. Snower & Co. v. United States*, 140 F.2d 367, 370 (7th Cir.1944). The district court was required to draw all reasonable inferences from the pleadings in Republic's favor, though the court was not bound by the legal characterizations Republic had given those facts. *See Prudential Insur-*

is confined to the pleadings. *Flora v. Home Federal Savings and Loan Association*, 685 F.2d 209, 211 (7th Cir.1982). Republic contends that the district court improperly considered matters outside the pleadings in granting PEC's motion. In particular, Republic claims that the district court relied upon a series of contracts, executed separately from the Agreement, which Republic had entered into with PEC regarding the sale of the furnaces. Republic concludes that the only document properly before the court below, and of record on appeal, is the Agreement, which it characterized as a contract for services and not for the sale of goods.

■ Before the district court, Republic also had argued that PEC's memoranda in support of its Rule 12(c) motion contained factual statements not part of the pleadings. Republic had requested that the district court, for that reason, treat PEC's motion as one for summary judgment. In fact, Republic had attached an affidavit to its final memorandum, averring to the nature of PEC's responsibilities under the Agreement, and concluded: "This court should deny [PEC's] Motion for Summary Judgment." Because both PEC and Republic had a reasonable opportunity to, and did in fact present materials pertinent to proceedings under Rule 56, it would have been entirely proper for the district court to have treated PEC's motion under Rule 12(c) as one for summary judgment. Fed. R.Civ.P. 12(c); *Schy v. Susquehanna Corp.*, 419 F.2d 1112, 1116 (7th Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Sager Glove Corp. v. Aetna Insurance Co.*, 317 F.2d 439, 441 (7th Cir.), *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). It is equally proper for us to do so now, and hence, we shall consider the record on appeal to include those undisputed statements of fact appearing in the affidavits submitted in support of or in opposition to PEC's motion. *Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762 (7th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Sager Glove Corp.*, 419 F.2d at 1116.

Turning now to the substance of Republic's contract claims, we note that this is an action in diversity, and the parties agree that Illinois law applies. We see no reason to disturb that stipulation. *Prudential Insurance Co. of America v. Sipula*, 776 F.2d 157, 161 (7th Cir.1985). Republic does not dispute that it filed suit outside the limitations period contained in the U.C.C.[3] Republic contends, however, that the sale of the furnaces was made pursuant to purchase orders separate from the Agreement. Republic concludes that the Agreement itself does not transfer title to any products or equipment, and, therefore, that it is not a contract for the sale of goods within the meaning of § 2–106 of the U.C.C.[4] Repub-

---

*ance Co. of America v. Sipula*, 776 F.2d 157, 159 (7th Cir.1985); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106–07 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (motions under Rule 12(b)(6)). If, upon so considering Republic's factual allegations, the district court had found that no material issue of fact had been presented, and that PEC was entitled to judgment as a matter of law, then disposition of Republic's contract claims under Rule 12(c) was appropriate. *Flora*, 685 F.2d at 211.

3. Ill.Ann.Stat. ch. 26, § 2–725, which codifies the U.C.C., provides in pertinent part:

    *Statute of Limitation in Contracts for Sale.*
    (1) An action for any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

    (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

4. Section 2–106 of the U.C.C. provides in pertinent part:

    (1) In this Article unless the context otherwise requires "contract" and "agreement" are limited to those relating to the present or future sale of goods. "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price....

lic also contends that, because the sale of the furnaces was transacted between it and a division of PEC, PECOR, which was acting as an independent supplier, PEC was not a seller within the meaning of the U.C.C.[5] Republic concludes that the four-year limitations period under § 2–725 does not apply to its agreement with PEC. We disagree with Republic's analysis and conclusions.

Republic's argument ignores the language of both its complaint and the Agreement. In Count II of its complaint, Republic alleged that PEC "did impliedly warrant that the [furnace] facility *provided* by it was of a good and merchantible [sic] quality *pursuant to the applicable provisions of the Uniform Commercial Code.*" Complaint ¶ 16 (emphasis added). Moreover, in its first memorandum in opposition to PEC's motion, Republic states "it bears repetition that [PEC] had an *exclusive licence* ... within the territory of North America to design, engineer, *sell* and install complete steel making facilities and equipment." Plaintiff's Response to Motion for Judgment on Pleadings, *Republic Steel Corp. v. Pennsylvania Engineering Corp.*, No. 82 C 5906, at 2 (N.D.Ill. filed July 20, 1984) (emphasis added). Republic also concedes that it "entered into more than one agreement with [PEC], including a separate and distinct agreement through its PECOR Division for the design and supply of the [furnaces]." *Id.* at 4.

The terms of the Agreement belie Republic's efforts to segregate the service component of its transaction with PEC. Section 2.09, entitled *Certain Purchase Orders In-corporated in this Agreement*, recites that:

> The following [Republic] Purchase Orders were issued to PEC for services by PEC, intended to be utilized in connection with the Q–BOP Facility:
>
> . . . .
>
> (e) No. 600–493400–332 dated 8/30/74
>
> (f) No. 600–493400–332 Rev. 1 dated 10/2/74
>
> . . . .
>
> The work performed under these Purchase Orders shall be deemed to have been performed under the terms of this Agreement, except that compensation paid or payable to PEC under such Purchase Orders shall be handled as provided in Section 4.06 of this Agreement.

The purchase orders referred to above are those for the two furnaces and drive assemblies at issue here. In addition, under section 2.10, "all of the documents incorporated in this Agreement by Annex shall be referred to as the 'Contract Documents.'"

■ The Scope of Supply and Responsibility Schedule ("Schedule"), Annex A to the Agreement, detailed the items and materials necessary for the assembly and the installation of the furnace facility, and assigned engineering, purchase, and installation responsibility as between Republic and PEC for each item. Under specification number 026 of the Schedule, the acquisition of the "two (2) 225 Ton Q–BOP Furnace [sic] Complete with Drive and Six (6) Removable Bottoms" was PEC's responsibility.[6] The initial purchase price of the fur-

---

5. Section 2–103(1) of the U.C.C. provides in pertinent part:
   (a) "Buyer" means a person who buys or contracts to buy goods.
   (b) "Seller" means a person who sells or contracts to sell goods.

6. At oral argument we granted PEC permission to supplement the record on appeal to include, among other documents, a "Recommendation for Placement" for the purchase of the furnaces and drive assemblies. The placement recommendation had been approved by Republic, and it authorized PEC to place a purchase order for the units with PECOR. These placement recommendations were made pursuant to one of the purchase orders referred to in section 2.09 of the Agreement. At the time permission to supplement the record was granted, we were under the understanding that the documents involved were before the district court but had been omitted by the parties in compiling the record on appeal. After a thorough examination of the record, we have concluded that these documents were not before the court below, and could not, therefore, be made a part of the record on appeal. *United States ex rel. Kellogg v. McBee*, 452 F.2d 134 (7th Cir.1971). However, Republic does not dispute the existence and nature of the placement recommendations averred to in an affidavit attached to PEC's second memorandum in support of its motion.

naces was $3.7 million. The final price, after adjustments, was over $5 million.[7] Because of the specific and detailed reference in the Agreement to the purchase of the furnaces, we find unconvincing Republic's argument that the Agreement memorializes a transaction unrelated to the sale of the furnaces. Even were we to assume that section 2.09 of the Agreement did not incorporate the purchase order for the furnaces, Illinois law requires us to construe together contracts which are executed by the same parties in the course of a single transaction. *See, e.g., Tepfer v. Deerfield Savings & Loan Association,* 118 Ill. App.3d 77, 73 Ill.Dec. 579, 454 N.E.2d 676 (1st Dist.1983).[8]

■ We are also not persuaded by Republic's argument that, because section 2.05 of the Agreement required PEC to treat PECOR, one of its divisions, as an "independent supplier" when placing an order with it, PEC was not a "seller," and hence, the Agreement between Republic and PEC was not a contract for sale within the meaning of the U.C.C. Section 2.05 of the Agreement does no more than define the scope of PEC's authority to act as a purchasing agent for Republic, and set forth PEC's duty to comply with Republic's

standard purchasing procedure when supplying equipment and parts to Republic under the Agreement. Section 2.05 contains the following proviso:

> To the extent suppliers, contractors, or vendors will not agree to the entire provisions of the Purchasing Procedure, Annex B hereto, PEC will inform [Republic], who must authorize PEC's then course of action with said supplier, contractor or vendor. PEC shall not be responsible, if after its best efforts, said suppliers, contractors or vendors refuse to comply. *When dealing with its divisions, subsidiaries and affiliates in connection with the subject matter of this Agreement (other than the Engineering Construction Division) PEC shall treat such divisions, subsidiaries and affiliates as independent Contractors, suppliers or vendors, as the case may be.*

Agreement § 2.05 (emphasis added).

Read in context, section 2.05 merely prohibits PEC from circumventing certain purchase procedures when dealing with its divisions such as PECOR. A similar provision is found in section 2.07 with regard to construction services that the Agreement obligated PEC to arrange and to oversee.[9]

---

Thus, the fact that PEC and Republic entered into a transaction to supply the furnaces is undisputed.

7. Republic argues that Article 4, which allocates fees payable to PEC, does not address payment to PEC for any components or equipment supplied under the Agreement. "Mention is only made for reimbursement for professional services." We would be hard pressed to follow Republic's interpretation of the Agreement on this point. Section 2.09 provides that:

> The work performed by PEC under these Purchase Orders shall be deemed to have been performed under the terms of this Agreement, except that compensation paid or payable to PEC under such Purchase Orders shall be handled as provided in Section 4.06 of this Agreement.

In addition, section 4.03, entitled *Fixed Fee,* provides:

> In compensation for all other services performed and *items supplied hereunder* ... [Republic] shall pay PEC a fee....

Yet, because we find unpersuasive Republic's attempt to characterize PECOR as an independent supplier for the purpose of avoiding the

applicability of the U.C.C., we express no opinion as to whether the Agreement provides that compensation be paid to PEC directly as opposed to PECOR, one of its divisions.

8. This general rule of contract law fully accords with the U.C.C. Section 1–201(3) of the U.C.C. defines "agreement" to be "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." Section 1–201(11) defines "contract" to be "the total legal obligation which results from the parties' agreement as affected by this Act and any other applicable rules of law."

9. Section 2.07 provides:

> *Construction Services.* PEC shall arrange as agent for [Republic], all services necessary to erect and install the [furnace] vessels and the vessel drives, and shall arrange, as agent for [Republic], the performance of such other construction services designated for PEC in the Scope of Supply and Responsibility Schedule (Annex A hereto) or by Change Notice.

Section 2.05, meant as it was to facilitate compliance with Republic's internal purchase procedures, cannot reasonably be read to redesignate one of PEC's divisions for the purpose of foreclosing the application of the U.C.C. to the transaction between Republic and PEC.[10] This is especially true in light of the language in Count II of Republic's complaint, discussed above, that indicates Republic's tacit understanding that the U.C.C. governed the legal consequences of a breach of the Agreement. Such language is entirely incongruous with the claim that the Agreement concerned solely the provision of services by PEC.

■ Viewing, as we must under Illinois law, the Agreement in conjunction with the placement recommendations and related documents, we reject Republic's contention that it contracted with PEC only for the provision of professional engineering services and not also for the sale of the furnaces. The agreement between Republic and PEC was, rather, "mixed," i.e., one both for the sale of goods and for the provision of services.

The question remaining for us to consider is whether, under Illinois law, the mixed sales/service agreement between Republic and PEC comes within the scope of the U.C.C. To resolve this issue we must determine whether the transaction between Republic and PEC was predominately one for the sale of goods with services incidentally involved, or was one for the rendition of services with the sale of goods incidentally involved. *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 n. 6 (7th Cir.1976).[11]

The Illinois Appellate Court recently has applied the predominant-character test to determine whether mixed contracts come within the scope of the U.C.C. *Yorke v. B.F. Goodrich Co.*, 130 Ill.App.3d 220, 85 Ill.Dec. 606, 474 N.E.2d 20 (2d Dist.1985) (transaction involving sale of vinyl pellets for the production of vinyl siding was contract for sale of goods despite seller's agreement to provide technical assistance); *Meeker v. Hamilton Grain Elevator Co.*, 110 Ill.App.3d 668, 66 Ill.Dec. 360, 442 N.E.2d 921 (4th Dist.1982) (a contract for the sale and erection of two grain bins was a contract for the sale of goods, and suit on it was barred by the limitations period of U.C.C. § 2–725(1)).

■ In assessing the character of the transaction between Republic and PEC, we may not be unmindful of Illinois law underscoring the broad coverage of the U.C.C. and emphasizing the need for uniformity in commercial transactions. *See, e.g., Meeker*, 110 Ill.App.3d at 669, 66 Ill.Dec. at 361, 442 N.E.2d at 922. We agree with the district court that "the rendition of the engineering services led directly to the construction of the furnaces which [was] the heart of the [Agreement]." The cost of the furnaces and drive assembly components was approximately $5 million. We do not doubt that the design, engineering, and purchase-agency services rendered by PEC in furtherance of the Agreement were substantial. That alone, though, is not sufficient to determine the predominant character of a contract for the purposes of the U.C.C. *Bonebrake v. Cox*, 499 F.2d 951, 958 (8th Cir.1974) (a contract for the sale and installation of bowling equipment concerned predominantly the sale of goods,

PEC will use its best efforts to comply with, and to cause contractors to execute and comply with, the terms and conditions of [Republic] Construction Contract terms, as set forth in Annex D hereto. *In the case of divisions, subsidiaries and affiliates of PEC (other than PEC's Engineering Construction Division) the provisions of the last paragraph of Section 2.05 shall be equally applicable to the provisions of this Section 2.07.*
*Id.* (emphasis added).

**10.** Although we do not rest our opinion on this ground, we note that it is a highly doubtful

proposition that parties to an agreement can avoid application of the U.C.C. by merely designating one division of the seller-corporation as a purchasing agent and another as an "independent contractor."

**11.** In *Pittsburgh-Des Moines Steel*, we held that, under Illinois law, a contract calling for the design, fabrication, and installation of a million-gallon water tank was a contract for the sale of goods and not for the rendition of services.

even though the amount of services rendered was substantial), *cited with approval in Pittsburgh-Des Moines Steel*, 532 F.2d at 580 n. 6. We hold that the Agreement between PEC and Republic was predominately a contract for the sale of the two furnaces, with the rendition of engineering, design, installation, and purchase-agency services incidental thereto. Thus, the limitations period under § 2–725(1) of the U.C.C. applies to the Agreement and bars Republic's contract claims.

### B.  Tort Claims

The district court granted PEC's motion under Fed.R.Civ.P. 12(b)(6), and dismissed Counts III, IV, and V of Republic's complaint, which alleged products-liability and negligence claims. The court relied on the Illinois Supreme Court's decision in *Moorman,* which held that a plaintiff may not recover in tort for economic loss resulting from a qualitative defect in a product.[12] As it did before the district court, Republic contends that PEC's primary responsibility with regard to the tilt-drive control panels was to act as Republic's purchasing agent and to provide design and engineering services. Republic concludes that the Agree-

ment between it and PEC constitutes a contract for the rendition of professional services, and hence, falls within an exception to the rule in *Moorman* precluding recovery in tort for economic losses.[13]

▇ Though PEC designated its motion as one for dismissal under Rule 12(b)(6), and the district court so treated it, the motion was not filed until after PEC had filed an answer to Republic's complaint. Thus, as a matter of motions practice, we must consider PEC's motion as a request for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Fed.R.Civ.P. 12(h)(2); *Schy*, 419 F.2d at 1115. Although PEC's motion performs the same function as a Rule 12(c) motion, we apply, nonetheless, the standard for a Rule 12(b)(6) motion in reviewing the district court's dismissal. *Slotnick v. Garfinkle*, 632 F.2d 163, 165 (1st Cir.1980); *Amersbach v. City of Cleveland*, 598 F.2d 1033, 1038 (6th Cir. 1979).

▇ ]In considering the propriety of the district court's dismissal of Republic's tort claims, therefore, we must accept the well-pleaded factual allegations of Republic's

12. The district court concluded:
> even without knowing the nature of the 'defective condition' alleged by [Republic], it is clear that ... [this] court is unable to characterize the defects in the drive assemblies as anything other than qualitative defect[s] relating to the purchaser's expectation in terms of the product's fitness to perform its intended function.

13. The question as to whether Illinois law recognizes an exception to the *Moorman* economic loss doctrine is a thorny one. As recently noted in *Adams Laboratories Inc. v. Jacobs Engineering Co.,* 761 F.2d 1218, 1223 (7th Cir.1985):
> [T]he issue of recovery of economic loss in a negligence action against a design professional is far from clear in the state of Illinois. The *Moorman* decision has been read broadly to bar such actions where the design professional is in direct privity with the plaintiff. See *Palatine National Bank v. Charles W. Greengard Associates, Inc.,* 119 Ill.App.3d 376, 74 Ill.Dec. 914, 456 N.E.2d 635 (1983). Contrary authority can also be found declining to extend the *Moorman* doctrine to persons providing professional design services, even though those persons were in privity of con-

tract with the plaintiff. See *Rosos Litho. Supply Corp. v. Hansen,* 123 Ill.App.3d 290, 78 Ill.Dec. 447, 462 N.E.2d 566 (1982) (limiting *Moorman* to situations in which a product or good is involved where the UCC provides protection to plaintiff with its implied warranties). Other Illinois Appellate Court cases have arrived at different conclusions in determining whether the *Moorman* decision bars recovery in negligence against the design professional for economic loss.

We ultimately did not reach the issue in *Adams Laboratories* as to whether a claim based upon the negligent rendition of professional services remains viable after *Moorman.* Rather we held that certain remarks made by counsel were prejudicial and required reversal, and remanded for a new trial.

The Illinois Supreme Court, in its most recent opportunity to review an application of the Moorman doctrine, determined that the issue was not squarely before it, and affirmed on other grounds. *Bates & Rogers Construction Corp. v. Greeley & Hansen,* 109 Ill.2d 225, 93 Ill.Dec. 369, 486 N.E.2d 902 (1985).

Because of our holding that the Agreement between Republic and PEC is not a contract for services, we also do not decide this issue.

complaint as true. *Hishon v. King & Spaulding*, 467 U.S. 69, ——, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1104 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). We are of course not bound by the legal characterizations Republic gives those facts. *Prudential*, 776 F.2d at 159.

The Agreement contains numerous warranty and liability clauses. Section 8.03, entitled *Cost of Defective Work*, provides:

Any engineering work which is in fact defective or does not meet the standards prescribed in this Agreement, shall be redone at no cost to [Republic].... Any PEC purchasing services required in connection with materials or equipment used for such rework shall be at no cost to [Republic], but the cost of material, equipment, construction labor, and other costs as well as costs relating to changes in existing structures by reason of any such rework shall be borne by [Republic].

Under section 8.05, entitled *Flow-through of Supplier Warranties:*

PEC shall cause [Republic] to be entitled to the benefit of all warranties, indemnifications, licenses and other rights negotiated by PEC with third parties pursuant hereto.:... PEC will use its best efforts to obtain warranties on all items of equipment extending until one year after startup of the Q–BOP Facility.

The Agreement specifically addresses the nature and extent of PEC's liability in Article 14. Section 14.01, entitled *Direct but no Consequential Liabilities*, provides:

PEC shall be liable for all direct damages suffered by [Republic] as a result of PEC's acts or omissions or acts or omissions of those for whom it is responsible in law, which shall exclude all vendors and contractors where PEC acts only as agent for [Republic]. It is also understood that in no event shall PEC be responsible for any indirect, special or consequential damages suffered by [Republic], including but without limitation of the foregoing, loss of profits, loss of production, business interruption, damages in the nature of penalties or fines which may be asserted by [Republic]....

Article 15, entitled *Responsibility of PEC*, provides that PEC shall not be responsible for:

any omission by [Republic], its employees, agents, and contractors.... PROVIDED that to the extent PEC, in carrying out its obligations of supervision of the installation and/or construction, Checkout and Start-Up of the facility, observes or otherwise becomes aware of the defective work being performed or defective materials being supplied by other contractors of [Republic] ... PEC shall ... use its reasonable best efforts to inform [Republic's] Representative of the same so that [Republic] can take such remedial action as [Republic] desires....

We express no opinion as to whether the liability and warranty clauses recited above would bar recovery of the damages Republic seeks for replacement or repair costs and loss of profits arising out of the defective control panels had Republic brought a timely suit on the Agreement. We mention these provisions in order to demonstrate that Republic and PEC entered into detailed and exhaustive covenants concerning the subject matter of Republic's tort claims.

We agree with the district court's characterization of the failure of the drive assemblies as a "qualitative defect[ ] relating to the purchaser's expectation in terms of the product's fitness to perform its intended function." [14] To allow Republic to proceed

---

14. Republic at one point suggests that the damages it is seeking in regard to the tilt-drive furnaces do not fall within the definition of "economic loss." Republic takes the position that only damages related to the defective part itself are properly considered economic loss damages, whereas damages caused to other parts of the furnace facility are not. We rejected such an argument in *Chicago Heights Venture v. Dynamit Nobel of America, Inc.*, 782 F.2d 723, 729 (7th Cir.1986) ("We believe ... that the

on tort theories in light of the exhaustive contract provisions noted above would cause the very mischief of which the Illinois Supreme Court disapproved in *Moorman*.[15] This is so irrespective of whether Republic's contract claims are barred by the U.C.C.'s limitations period.

In holding that Republic's contract claims were barred by the § 2–725(1) limitations period, we concluded that the predominant character of the Agreement between it and PEC was that of a contract for the sale of goods, not for the rendition of services. In effect, Republic is asking us now to segregate the service component from the Agreement in order to provide it with a remedy in tort because its contract claims are time-barred. For the reasons stated above, we decline to do so. Thus, Counts III, IV, and V of Republic's complaint fail to state claims upon which relief can be granted.

### III

We have treated the district court's entry of judgment on the pleadings in favor of PEC on Counts I and II as a Rule 56 summary judgment, and the district court's dismissal of Counts III, IV, and V under Rule 12(b)(6) as the entry of judgment on the pleadings in favor of PEC. For the reasons stated above, and as so modified,[16] the orders of the district court are

Affirmed.

Illinois courts would not consider this difference to be legally significant.")

**15.** In *Moorman*, the Illinois Supreme Court, quoting from *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1172–73 (3d Cir.1981), concluded:

Although strict liability in tort developed out of the law of warranties, the courts of most states have recognized that the principles of warranty law remain the appropriate vehicle to redress a purchaser's disappointed expectations when a defect renders a product inferior or unable adequately to perform its intended function.... These courts have classified the damages consequent to qualitative defects, such as reduced value, return of purchase price, repair and replacement, or lost profits, as economic loss, and have relegated those who suffer such commercial loss to the remedies of contract law.

*Moorman*, 91 Ill.2d at 84, 61 Ill.Dec. at 753, 435 N.E.2d at 450. In limiting recovery of economic loss arising out of disappointed commercial expectations to claims brought on a contract, the court in *Moorman* emphasized that:

Allowing an aggrieved party to recover under a negligence theory solely for economic loss would constitute an unwarranted infringement upon the scheme provided by the UCC. *Moorman*, 91 Ill.2d at 88, 61 Ill.Dec. at 755, 435 N.E.2d at 452.

For a discussion of the policy considerations guiding the court's decision in *Moorman*, see our recent opinion in *Chicago Heights Venture v. Dynamit Nobel of America*, 782 F.2d 723, 726–730 (7th Cir.1986).

**16.** *See Roberts v. American Airlines Inc.*, 526 F.2d 757, 762 (7th Cir.1975); *Schy v. Susquehanna Corp.*, 419 F.2d 1112, 1115 (7th Cir.1970).