**KISHWAUKEE COMMUNITY HEALTH SERVICES CENTER, Plaintiff,**

v.

**HOSPITAL BUILDING AND EQUIPMENT COMPANY, et al., Defendants.**

No. 80 C 1850.

United States District Court, N.D. Illinois, E.D.

June 24, 1986.

Gerard E. Grashorn, Richard J. Brennan, John R. Herrmann, Winston & Strawn, Chicago, Ill., Boyle Cordes & Witheft, DeKalb, Ill., for plaintiff.

Robert J. Zaideman, Zaideman & Esrig, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

This construction dispute is before us on the defendants' motion to dismiss Count III of plaintiff's three-count complaint based on the doctrine first announced in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). Defendants have also moved for partial summary judgment based on the statute of limitations. For the reasons given below, judgment on the pleadings is granted in defendants' favor as to Count III; their motion for summary judgment is denied; and summary judgment is granted to plaintiff on the issue of statutes of limitations.

**FACTS**

According to plaintiff's first amended complaint, plaintiff is a not-for-profit corporation. The four defendants—Hospital Building and Equipment Co. ("HBE"), Hospital Designers, Inc. ("HDI"), and two HDI employees—were jointly engaged in the business of designing and constructing hos-

pital buildings. Plaintiff alleges that each defendant acted as agent for the others in their business activity as designers and builders.[1]

Prior to November 1973, plaintiff conducted a search for a firm to build a new community hospital on plaintiff's site. It invited defendants to make a presentation, which they did in 1971. During this presentation, defendants made various representations, including that they would provide a hospital designed and built with the highest degree of skill attainable. After this presentation, plaintiff apparently agreed to have defendants present to plaintiff a design for the hospital: if plaintiff accepted the design, plaintiff then agreed to contract with defendants to build the hospital. Plaintiff's First Amended Complaint ¶ 10.

Defendants' design was apparently completed in November 1973, at which point they tendered to plaintiff a series of documents to be executed as an agreement between the defendants and plaintiff. In this agreement, plaintiff agreed to pay HBE $6,435,000.00 for HBE's services in designing and constructing the hospital. The agreement indicated that HDI and HDI's employees were to be the hospital's architects, and that the contract sum included the architects' charges. The agreement also stated that the architects were employed by the contractor (HBE). *Id.* at Count I, ¶¶ 13, 15.

Construction began in November 1973 and was substantially completed in February 1976. Plaintiff states in a memorandum and defendants do not deny that plaintiff first began to occupy the hospital on December 28, 1975. Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss and for Partial Summary Judgment at 8. The certificate of substantial completion, dated September 19, 1977, also states that the date of substantial completion and the date of owner acceptance is established as February 1, 1976. *Id.,* Exh. A.

Plaintiff alleges that the hospital suffers from defects in both design and construction. *See id., e.g.,* Count I, ¶ 18 (design), ¶ 19 (construction). Its first amended complaint consists of three counts. In Count I, plaintiff claims that these defects constitute a breach of plaintiff's express contract with defendants. Plaintiff is apparently delineating as its express contract the written documents and an oral agreement, perhaps flowing from defendants' representations in their 1971 representation. *See* Plaintiff Memorandum in Opposition at 8. In Count II, plaintiff claims a breach of an implied contract with the defendants. Count III is based on the defendants' alleged negligence in designing and supervising construction of the hospital.

Plaintiff's original complaint was filed on April 7, 1980. It filed its first amended complaint on January 11, 1983. Defendants answered the first amended complaint on April 4, 1983, and filed the instant motion to dismiss and motion for summary judgment on September 11, 1984.

## DISCUSSION

Plaintiff raises three arguments in opposition to defendants' motions. First, it argues that the motions are untimely. Second, it contends that the doctrine announced in *Moorman* does not bar Count III. Finally, it denies that the relevant statutes of limitations bar relief for certain of their claims.

### Timeliness of Defendants' Motions

■ Defendants' motion to dismiss Count III is technically not a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), because defendants answered the first amended complaint prior to filing their motions. *See* C. Wright and A. Miller, 5 *Federal Practice and Procedure* § 1361 at 644 (1969). Instead, it is a motion for judgment on the pleadings, *see* Fed.R.Civ.P. 12(c), which can be made at any time prior to trial, as long as the motion is not inter-

---

1. The defendants are all non-Illinois residents, and both plaintiff and defendants have looked to Illinois substantive law for support of their positions. We agree that Illinois substantive law applies.

posed merely for purposes of delay. *See* Wright and Miller at § 1361, p. 644; Fed.R. Civ.P. 12(h)(2). *See also Dunlap v. Aulson Corp.*, 90 F.R.D. 647, 653 (D.N.H.1981); *Valentine v. Drug Enforcement Administration*, 544 F.Supp. 830, 833 (N.D.Ill. 1982); *Sorin v. Board of Education of the City School District of Warrensville Heights*, 464 F.Supp. 50, 51–52 (N.D.Ohio 1978). Defendants filed their motions after we had set the trial of this case for October 4, 1984. We then struck the trial date and did not set a new fixed date. Plaintiff contends that the filing of the motions after the setting of an imminent fixed trial date indicates that the motion was filed for purposes of delay.

We disagree. The trial date in this case had been stricken twice before cancellation of the October date, due to our crowded trial calendar. Defendants have no previous history of indulging in delaying tactics, and plaintiff did not file its amended complaint until 1983. Additionally, the subject of the motion to dismiss, *Moorman*, involves a continually evolving doctrine, *see infra* at 6–15, which also excuses somewhat a delayed filing of the motion. Therefore, we do not find that the motion was interposed for reasons of delay.

Defendants' motion for partial summary judgment, based on the statute of limitations, is also timely. The statute of limitations is an affirmative defense, *see* Fed.R. Civ.P. 8(c), and was raised in defendants' answer to the first amended complaint. Defendants' motion for summary judgment can be raised at "any time," *see* Fed.R. Civ.P. 56, and we do not find that this motion was interposed for purposes of delay. *See* Wright and Miller at § 1278. *See also Roe v. Sears, Roebuck and Co.*, 132 F.2d 829 (7th Cir.1943).

**Count III: Moorman**

The *Moorman* doctrine was announced by the Illinois Supreme Court in 1982. Since that time, the doctrine has generated much litigation and debate, because, like many legal theories, it is understandable in the abstract, but difficult to apply in specific case situations. *See* T. Bertschy, "The Economic Loss Doctrine in Illinois after *Moorman*," 71 Ill.Bar.J. 346, 355 (1983).

Basically, the doctrine bars a plaintiff from suing in tort when he has an alternate avenue for relief, such as an action in contract or warranty. At times, the decision whether a plaintiff may also sue in tort is academic, because the plaintiff will receive the full compensation he seeks through his alternate non-tort avenues. When, however, a plaintiff seeks damages which are recoverable in tort but not normally recoverable in contract, such as punitive or unforeseen consequential damages, the issue of whether *Moorman* bars the suit in tort becomes important. *See Moorman*, 91 Ill.2d at 79, 61 Ill.Dec. at 750, 435 N.E.2d at 447 ("application of the rules of warranty prevents a manufacturer from being held liable for damages of unknown and unlimited scope"). Whether a tort remedy is available may also become important when the plaintiff is a subsequent purchaser of a product. In Illinois, a plaintiff need not be in privity with the defendant to recover for property damages against remote sellers or manufacturers in tort. But if a purchaser can only pursue a warranty action, he may not be able to recover at all from the remote seller or manufacturer. *See Bertschy* at 354–55. Finally, whether a tort action is available may be important for proof purposes, if a plaintiff wishes to pursue a strict liability theory. For example, if a plaintiff can sue under such a theory, he may be able to avoid defenses which a defendant can raise in contract actions, such as disclaimer. *See Moorman*, 91 Ill.2d at 79, 435 N.E.2d at 447. *See generally East River Steamship Corp. v. Transamerica Delaval, Inc.*, — U.S. —, —, 106 S.Ct. 2295, —, 90 L.Ed.2d 865 (1986).

Defendants' motion raises two of the most difficult issues involved in applying the *Moorman* doctrine: what constitutes "economic loss," and to what extent does *Moorman* apply to professional services.

**A. Economic Loss**

**Moorman—Majority Opinion**

In *Moorman*, the Illinois Supreme Court ruled that a purchaser of a tank could not

sue the tank's manufacturer in tort for negligent design after a crack developed in the tank, because the purchaser sought recovery only for his "economic loss," that is, the cost of repairing the tank and his loss of use of the tank. *Moorman,* 91 Ill.2d at 73, 61 Ill.Dec. at 748, 435 N.E.2d at 445. The Court stated that tort suits are limited to cases involving "unreasonably dangerous defects resulting in physical harm to the ultimate user or consumer, or to his property." *Id.* at 78, 61 Ill.Dec. at 750, 435 N.E.2d at 447. This is because when the damage complained of does not result from an unreasonable risk, but rather because a product is unfit for its intended use, contract remedies are more appropriate to protect the plaintiff's expectation interests. *Id.* at 81, 61 Ill.Dec. at 751, 435 N.E.2d at 448.

The majority opinion described in detail what constitutes economic loss: "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property"; "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Id.* at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449, *citing* Note, "Economic Loss in Products Liability Jurisprudence," 66 Colum.L.Rev. 917, 918 (1966); Comment, "Manufacturers' Liability to Remote Purchaser for 'Economic Loss' Damages—Tort or Contract?" 114 U.Pa.L.Rev. 539, 541 (1966).

The demarcation between physical harm or property damage and economic loss depends upon the nature of the defect and the manner in which the damage occurred. *Moorman,* 91 Ill.2d at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449. For example, when a defect causes an accident involving violence or collision with external objects, that is property damage, not economic loss. When the damage is due to deterioration, internal breakage or other "non-accidental causes," that is economic loss. *Id.* at 83, 61 Ill.Dec. at 752, 435 N.E.2d at 449.

The Court then discussed several examples of economic loss and property damage situations. For example, when a roof buckles, the plaintiff's damages for repair and replacement costs for the roof constitutes economic loss. *Id.* at 83, 61 Ill.Dec. at 752, 435 N.E.2d at 449, *citing Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 288 (3d Cir. 1980). In contrast, when polyurethane padding in a trailer causes a fire in the trailer, the damage caused to the trailer constitutes property damage, since the damage was "sudden and calamitious." *Moorman,* 91 Ill.2d at 83, 61 Ill.Dec. at 752, 435 N.E.2d at 449, *citing Cloud v. Kit Manufacturing Co.,* 563 P.2d 248, 251 (Alaska 1977). Similarly, damage to a front-end loader as a result of a fire, a "sudden and highly dangerous occurrence," caused by an alleged defect that poses a serious risk of harm to people and property, constitutes property damage. *Moorman,* 91 Ill.2d at 84, 61 Ill.Dec. at 753, 435 N.E.2d at 450, *citing Pennsylvania Glass Sand Corp. v. Caterpillar Tractor,* 652 F.2d 1165, 1169 (3d Cir.1981).

The plaintiff in *Moorman* argued that the crack in the tank had developed suddenly, and, therefore, the injury was property damage. The Court disagreed. The crack had developed over a period of months, and the Court stated that:

> this was not the type of sudden and dangerous occurrence best served by the policy of tort law that the manufacturer should bear the risk of hazardous products. Rather, like the factual situation in *Jones & Laughlin Steel,* and unlike that in *Cloud* and *Pennsylvania Glass,* the harm resulted from a qualitative defect relating to the purchaser's expectation in terms of the product's fitness to perform its intended function. Plaintiff suffered a commercial loss of the type that the law of warranty is designed to protect. Consequently, repair and reinforcement of the tank and loss of the tank's use constitute economic losses for which plaintiff cannot recover under a theory of strick liability in tort.

*Id.,* 91 Ill.2d at 85–86, 61 Ill.Dec. at 753, 435 N.E.2d at 450. The Court also found such damages not recoverable under a negligence theory because "contract, rather than tort law provided the appropriate set of rules for recovery." *Id.* at 26, 61 Ill. Dec. at 753, 435 N.E.2d at 451.

One could reasonably interpret this discussion of economic loss to approve one (or more) of three different tests. A loss is not "economic" and a plaintiff may sue in tort if:

(1) the damage alleged involves anything outside of the product itself (the "bright line" test);

(2) one would not expect the resulting damage to be caused by the product's failure to perform its intended function (the "commercial expectation" test); or

(3) the damage occurred in a sudden and dangerous manner (the "sudden and dangerous" test).

The last, test, the "sudden and dangerous" test, could in turn be divided into "potential" and "actual" tests; it is unclear whether the majority's discussion of sudden and dangerous occurrences treats resulting damages as economic loss if the event *did* cause grave harm or *could have* caused great harm.

### Moorman—Concurring Opinion

In his concurrence in *Moorman,* Justice Simon appears to believe that the majority was proposing the "bright line" test, while he favors the "commercial expectation" or "sudden and dangerous" test. *Id.* at 95–99, 61 Ill.Dec. at 757–59, 435 N.E.2d at 455–57. Justice Simon warned that economic loss should not be defined as the absence or opposite of physical harm, because anomalous results could develop. For example, if an oven malfunctions and has to be replaced or repaired, the damage is clearly economic loss. But if the roast inside the oven is burnt to a crisp, thus harming property outside the malfunctioning product itself, Justice Simon thought it illogical to allow a suit in tort. *Id.* at 95, 61 Ill.Dec. at 757, 435 N.E.2d at 455.

Under Justice Simon's test, one looks to the policies behind contract and tort law. If a product destroys an employee's morale or a customer's good will, or a product "goes beserk," then the plaintiff's remedy lies in tort. On the other hand, if the product just does not function as promised, then only a contract interest has been invaded. *Id.* at 96, 61 Ill.Dec. at 757, 435 N.E.2d at 455. Thus, Justice Simon appears to favor a "commercial expectation" test—if a refrigerator breaks and spoils food, the damage to the food, while outside the malfunctioning product itself, can be expected if the refrigerator fails to refrigerate. Therefore, the spoilage is solely economic loss. *See id.* at 96, 61 Ill.Dec. at 757, 435 N.E.2d at 455. However, Justice Simon's test also involves at least a "sudden and dangerous" component, because he added that such a breakdown is not dangerous—the only risk is to commercial expectations. *Id.,* 61 Ill.Dec.at 757, 435 N.E.2d at 455.

Thus, the difficulty in applying *Moorman* is determining which test to apply: was the Court proposing a bright line, commercial expectation or sudden and dangerous test, or some combination of the three. Also, none of these tests appears to fulfill the Court's objectives consistently. For example, if a product's function is such that an expected result of the breakdown of that function could be dangerous, is the damage economic loss? For example, if a truck's brakes fail, one can expect damage to persons or property, and the Court in *Moorman* clearly contemplated that such damages would not constitute economic loss. *Id.* at 81, 61 Ill.Dec. at 751, 435 N.E.2d at 448. Yet, under a strict commercial expectation theory, such damages would constitute economic loss, since that very harm is an expected result of breakdown of the product's intended function. Or, what if someone became sick from eating spoiled food from Justice Simon's broken refrigerator? That would be an expected or at least an actual result, but Justice Simon labeled a refrigerator breakdown an event resulting only in economic loss. Justice Simon's refrigerator example

at least implies that if one does employ a sudden and dangerous test, it is only applicable when grave harm actually results—when someone does become sick from the food. But applying an actual as opposed to a potential sudden and dangerous test would be inconsistent with the policy behind such a test, as the majority in *Moorman* recognized. *Id.* The point of having tort remedies for grave harm is that a manufacturer of a product that might cause such harm should be induced to prevent it. If a manufacturer releases a product that can reasonably be expected to produce grave harm, society still wants to induce the manufacturer to prevent that harm: it is the *risk* of injury that provides the justification for a suit in tort. *Id.* For example, if by luck a truck with defective brakes causes only property damage with no harm to persons, the policies underlying imposition of tort remedies still support tort damages as an inducement to repair the design defect causing potential harm. *See id.* Finally, applying any kind of sudden and dangerous test when only damage to the product occurs is inconsistent with the major thrust of the *Moorman* holding: when, other "harm to the product itself occurs, even through an abrupt accident-like event, the resulting loss (repair costs, decreased value and lost profit) is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *East River,* — U.S. —, 106 S.Ct. 2295.

### Post-Moorman: Illinois Supreme Court

Cases decided subsequent to *Moorman* fail to clarify which test is to be applied or to reconcile the inconsistencies in applying whichever test is chosen. In the first two post-*Moorman* Supreme Court cases, the Court extended application of the *Moorman* doctrine to non-Uniform Commercial Code ("UCC") situations, specifically construction disputes. *Redarowicz v. Ohlendorg,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982); *Foxcroft Townhome Owners Association v. Hoffman Rosen Corp.,* 96 Ill.2d 150, 70 Ill.Dec. 251, 449 N.E.2d 125 (1983). In *Redarowicz,* a homeowner who bought his home from the origi-

nal owner sued the builder in both contract and tort. He alleged that the chimney and adjoining wall were beginning to pull away from the house, the basement wall had cracked and leaked, the roof leaked and the patio showed signs of defective construction. As damages, he sought the costs of repair and replacement of the chimney, wall and patio. The Court held that the tort count was barred by *Moorman* because the plaintiff sought recovery soley for economic loss. In explaining its decision,, the Court stated that in order to sue in tort, a plaintiff must demonstrate harm above and beyond disappointed expectations. *Redarowicz,* 92 Ill.2d at 177, 65 Ill.Dec. at 414, 441 N.E.2d at 327. Therefore, the Court appears to have applied the "commercial expectation" test. The Court added, however, that the plaintiff had not alleged that anyone had been hurt by a brick falling from a chimney, or that a wall had collapsed on furniture. *Id.,* 65 Ill.Dec. at 414, 441 N.E.2d at 327. This seems like the bright line test, rather than the commercial expectation test, since, if a wall or chimney is defective in its intended function, one could expect such results: a wall is intended to stand up and support; if it does not, it is likely to fall on something.

Similarly, in *Foxcroft,* condominium residents sued the builder and developer for latent construction defects in the building. The Court held that since the defects caused only economic loss, the plaintiffs could not sue in tort: as damages, plaintiffs sought repair and replacement costs and diminished market value. The Court explained that, as in *Redarowicz,* the plaintiffs were merely complaining of deterioration: there were no allegations of personal injury, other property damage, or damage resulting from a sudden and dangerous occurrence. *Foxcroft,* 96 Ill.2d at 156, 70 Ill.Dec. 254, 449 N.E.2d at 128. Therefore, in *Foxcroft,* the Court could have been applying any or all three of the tests.

Recently, the Court decided another construction case. *Morrow v. Goldschmidt Associates, Inc.,* 112 Ill.2d 87, 96 Ill.Dec. 939, 492 N.E.2d 181, (S.Ct.1986). There,

the plaintiff purchasers of four townhouses sued the townhouses' builders for inadequate construction and supervision of the construction of the townhouses, resulting in numerous defects in the houses. The Court held that plaintiffs could not sue the defendants in tort because the plaintiffs sought to recover only the costs of repairs to their homes caused by the defendants' alleged faulty workmanship:

> Like the plaintiff in *Redarowicz,* the plaintiffs here have not alleged a harm "above and beyond disappointed expectations." [citing *Redarowicz*] They do not complain that the defects caused an accident which resulted in physical injury or damage to other property. Indeed, contrary to the findings of the appellate court, nowhere in plaintiffs' complaint is it alleged that the defects were a threat to health or safety. As such, the plaintiffs essentially are complaining that they did not receive the benefit of their bargain—a harm which is appropriately remedied by bringing an action for breach of contract.

*Morrow,* at 97, 96 Ill.Dec. 939, 492 N.E.2d 181.

Once again, the Court in *Morrow* could have been approving the bright line or commercial expectation test. Justice Goldenhersh dissented, apparently because, like Justice Simon in the original *Moorman* opinion, he understood the Court to be applying a bright line test:

> The dismissed counts contained factual allegations of potentially life-threatening structural defects and actions on the part of defendants which constitute wilful and wanton misconduct. If, as a result of one of the alleged defects, one of the plaintiffs had suffered personal injuries, or his property had been damaged or destroyed, the majority would agree that he had a cause of action. If the facts alleged, except for the absence of personal injuries or property damage, state a cause of action, the fortuitous circumstances that no such injury or damage was suffered should not bar it.

*Id.* at 8 (Goldenhersh, J., dissenting). It appears that Justice Goldenhersh would utilize a fourth test, taking into account the potential harm that could have resulted from the conduct alleged. *But see East River,* —— U.S. at ——, 106 S.Ct. at ——, (rejecting potential injury test for suits in admiralty).

In its most recent opinion on this subject, *Scott & Fetzer Co. v. Montgomery Ward & Co.,* 122 Ill.2d 378, 98 Ill.Dec. 1, 493 N.E.2d 1022 (S.Ct.1986), the Court found that the *Moorman* doctrine did not bar recovery in tort. There, a fire occurred in a warehouse, and the warehouse's tenants sued the supplier of the fire-warning system for the warehouse. The system allegedly failed, and the fire caused extensive damage to property stored in the warehouse. The Court held that the *Moorman* doctrine did not apply because first, the tenants sought damages for loss of property other than the defective product. *Id.* at 5. Second, the Court noted that a fire is a sudden and dangerous event. *Id.* Thus, the Court applied both the brightline and the sudden and dangerous tests.

### Post-Moorman: Seventh Circuit

The Seventh Circuit appears to reject the bright line test in favor of a commercial expectation approach and to be undecided in its views toward the sudden and dangerous test. *See Chicago Heights Venture v. Dynamit Nobel of America, Inc.,* 782 F.2d 723 (7th Cir.1986). There, the plaintiffs complained of defective roofing material manufactured and installed by the defendants, which resulted in damage to the roof, a water leak in the building, damage to ceilings and floors, and loosened bricks. The court held that the situation was similar to that found in *Redarowicz* and *Foxcroft:* plaintiffs complained of latent structural defects, and, therefore, could not sue in tort. The fact that the event precipitating suit, the roof's collapse, was dramatic, and that plaintiffs complained of harm to property other than the roof, did not affect the court's view. The roof had deteriorated over time, like the tank in *Moorman.* *Chicago Heights,* 782 F.2d at 729.

The injury to other property was not "legally significant," since plaintiffs were complaining that the roof did not perform its intended function, which is the crucial factor in applying *Moorman*. *Id.* By rejecting damage to other property as a relevant factor, the Seventh Circuit apparently rejected the bright line test in favor of the commercial expectation test.

### Application of Moorman and Post-Moorman Decisions to This Case

■ Here, plaintiff states that it seeks damages for non-economic loss because it alleges that the hospital's defective roof, retaining walls, and oil tank caused consequential property damage. First Amended Complaint, Count III. For example, the leaky oil tank allegedly led to destruction of the hospital's emergency generator. *Id.* at ¶ 20(b). Given the Seventh Circuit's interpretation of *Moorman* in *Chicago Heights*, we are compelled to apply the commercial expectation test and rule that the doctrine applies. Plaintiff is complaining of latent structural defects and alleging that the building did not work as promised. While one could read the Illinois cases as adopting a bright line test, the Seventh Circuit's interpretation is by no means unreasonable, and we follow it here.

### B. Professional Services

In Count III, plaintiff complains about defendants' negligent design and supervision of construction. He argues that even if this count seeks relief only for economic loss it is not barred by *Moorman* because defendants are sued not as contractors but as architects. Relying on two Illinois appellate court decisions, plaintiff argues that the *Moorman* doctrine does not apply to suits for an architect's negligent performance of his professional duties. *Rosos Litho Supply Corp. v. Hansen*, 123 Ill. App.3d 290, 78 Ill.Dec. 447, 462 N.E.2d 566 (1st Dist.1984); *Ferentchak v. Village of Frankfort*, 121 Ill.App.3d 599, 76 Ill.Dec. 950, 459 N.E.2d 1085 (3d Cir.1984), *rev'd. on other grounds*, 105 Ill.2d 474, 86 Ill. Dec. 443, 475 N.E.2d 822 (1985).

Unfortunately, the issue of whether a plaintiff is barred under *Moorman* from suing a professional such as an architect for his economic losses is open to even more debate than the definition of economic loss issue. *See Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 182 n. 13 (7th Cir.1986) (professional service issue "thorny"); *Adams Laboratories v. Jacobs Engineering Co., Inc.*, 761 F.2d 1218, 1223 (7th Cir.1985) (issue "far from clear"). The Illinois Supreme Court has twice been presented with this issue, but based its opinions in those cases on alternate grounds. *Bates & Rogers Construction v. North Shore Sanitary District*, 128 Ill.App.3d 962, 84 Ill.Dec. 149, 471 N.E.2d 915 (2d Cir.1984), *aff'd. on other grounds*, 109 Ill.2d 225, 93 Ill.Dec. 369, 486 N.E.2d 902 (1985); *Ferentchak*, 105 Ill.2d at 479, 86 Ill.Dec. 443, 475 N.E.2d at 825. In *Republic Steel* and *Adams*, the Seventh Circuit avoided having to rule on this issue. *See Republic Steel*, 785 F.2d at 182 n. 13; *Adams*, 761 F.2d at 1224. Therefore, we are left with Illinois appellate court and federal district court decisions for guidance.

### Palatine, Ferentchak and Rosos Litho

The first case to discuss whether the *Moorman* doctrine should be applied in negligence cases against design professionals was *Palatine National Bank v. Charles W. Greengard Associates*, 119 Ill. App.3d 376, 74 Ill.Dec. 914, 456 N.E.2d 635 (2d Dist.1983). There, property developers sued an engineering firm for inadequate design of a water drainage system and landscape grading. The court held that *Moorman* barred the action because the same principles present in *Moorman* were present in the plaintiffs' situation: as in *Moorman*, the plaintiffs complained about a design defect; they complained that the system did not function as intended; and they sought lost profits and repair costs. *Id.* at 380, 74 Ill.Dec. 914, 456 N.E.2d at 638.

In *Ferentchak*, homeowners sued a builder, a village and an architect based on a negligently designed surface water drain-

age system and foundation grade. The architect was employed by the builder, not the plaintiffs. The court held that under *Redarowicz* the plaintiffs could not sue the builder for negligence: the plaintiffs had contracted with the builder, and had expected him to produce a suitable product. Therefore, plaintiffs' remedy for the builder's failure to meet their commercial expectations lay in contract law. Plaintiffs could, however, sue the architect and village in tort, because they had no adequate contract or warranty remedies against them. The court in *Ferentchak* read *Moorman* and its progeny to bar a tort action only where the plaintiff is claiming nothing but economic loss *and* has an adequate remedy in contract or warranty law. If there is no contract or warranty remedy, then the harm does not relate to commercial expectations but to traditional societal expectations, permitting suit in tort. *Ferentchak,* 121 Ill.App.3d at 606, 76 Ill.Dec. at 956, 459 N.E.2d at 1091. The court expressly noted that the architect was not in privity with the plaintiffs, but rather, owed his duties to the developer. *Id.* at 608, 76 Ill.Dec. at 957, 459 N.E.2d at 1092.

Next, in *Rosos Litho,* an owner sued his contractors and an architect for negligence. The court held that he could sue the architect, even though they were in privity, because architects hold themselves out to the public as experts and have traditionally been subject to malpractice suits like any other professional. If *Moorman* were applied, the court felt that an entire established body of malpractice law would be eliminated, which had not been the *Moorman* court's intent. *Rosos Litho,* 123 Ill. App.3d at 295, 78 Ill.Dec. at 452, 462 N.E.2d at 571. While the owner did have a contract with the architect, he lacked the warranty remedies present in *Moorman,* and the court believed that fact also supported a tort remedy. *Id.* at 295, 462 N.E.2d at 571.

### Bates

In *Bates,* the court barred suit against architect-engineers pursuant to *Moorman.* There, a contractor and subcontractor sued the architect-engineers and a sanitary district for the negligent design of certain equipment as well as for negligent supervision. The architect-engineers had a contract with the district to act as the project's contractors. There was no privity between the plaintiffs and the architect-engineers.

The court noted that in *Redarowicz,. see supra* at 1497–98, the plaintiff homeowner had had no privity with the defendant (although the plaintiff had been in the chain of ownership); yet that did not warrant treatment different from the tank purchaser in *Moorman*—suit was barred. Similarly, in *Foxcroft, see supra* at 1498), the plaintiffs on appeal had no privity with the defendants, and their suit was barred.

The *Bates* court distinguished *Ferentchak* by noting that while the plaintiff in *Bates* only had a contract with the sanitary district, the sanitary district assumed responsibility for the plaintiff's damages caused by the engineers' plans. Therefore, while the plaintiffs in *Bates* could not sue the architects in contract directly, they could sue the district, and the district could probably sue the engineers.

The court interpreted both *Ferentchak* and *Rosos Litho* as focusing on the lack of an adequate remedy to compensate the plaintiff's disappointed expectation interest. *Bates,* 128 Ill.App.3d at 975, 84 Ill. Dec. at 157–58, 471 N.E.2d at 923–24. *Rosos Litho* had found two expectation interests—in (1) the product's quality, and (2) the performance anyone hiring a professional expects from that professional. In contrast, in *Bates,* the court found that the only harm complained of was to plaintiffs' expectation that the job would be done and that their contract with the district would be completed. Perhaps, the court stated, a tort remedy should be allowed for a plaintiff who hires an architect directly and is disappointed to his economic detriment. But where the plaintiffs do not hire the architect-engineers and do have a remedy for their disappointed expectations concerning the quality of the product, they cannot sue in tort. *Bates,* 128 Ill.App.3d at 975, 84 Ill.Dec. at 159, 471 N.E.2d at 925.

In a concurrence, Justice Reinhard states that he believes that *Rosos Litho,* was simply decided incorrectly. *Moorman* had carved out no exceptions for professionals, so under *Moorman,* the suit in tort was barred. *Id.* at 977, 84 Ill.Dec. at 159, 471 N.E.2d at 925. *See also Anderson Electric, Inc. v. Ledbetter Erector Corp.,* 133 Ill.App.3d 844, 88 Ill.Dec. 863, 479 N.E.2d 476 (4th Dist.1985) (subcontractor barred from suing construction supervisor in tort because *Moorman* states no exceptions for professionals).

### Federal Courts

A federal court from this district took the *Ferentchak* approach: it stated that an engineer could be sued for negligence when a plaintiff has no contract or warranty remedy against him. *Intamin, Inc. v. Figley-Wright Contractors,* 608 F.Supp. 408, 411 (N.D.Ill.1985).

Although not directly on point, we also find the Eleventh Circuit's opinion in *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 950 (11th Cir.1982), instructive, because it applies a Georgia rule of law similar to the *Moorman* doctrine. There, the court held that a designer could not be sued in tort for negligence in designing a traveling ship unloader. The court noted that the Georgia rule made no exceptions for professionals, and that the court would be particularly reluctant to carve out such an exceptions where the professional service relates to a product, since such an exception would substantially defeat the rule. *Id.* at 950.

The Seventh Circuit's opinion in *Republic Steel,* while also not directly on point, does provide some guidance. There, the court affirmed dismissal of a negligence count based on faulty design and assembly of a furnace. While not ruling on the professional service issue, the court did voice its disapproval of the plaintiff's attempt to segregate the service component from its contractual agreement with the defendant in order to obtain a tort remedy. *Republic Steel,* 785 F.2d at 184. Like the court in *Flintkote,* the Seventh Circuit apparently disapproves the evisceration of the *Moor-*

*man* rule when plaintiffs sue in tort for injuries that are primarily product related.

In three cases, we have stated that the *Moorman* doctrine did not bar negligence suits, because the defendants provided services: *Jernryd v. Nilsson,* No. 84 C. 7551, Memorandum op. at 40 n. 17 (N.D.Ill. Nov. 16, 1985) (Grady, J.) [Available on WEST-LAW, DCTU database]; *Stocking v. Transam Distribution Service, Inc.,* No. 83 C 1622 Memorandum op. at 7–9 (N.D.Ill. Feb. 12, 1985) (Grady, J.); and *In re Continental Illinois Securities Litigation,* 603 F.Supp. 773, 774 (N.D.Ill.1985). *Continental* and *Jernryd* involved banking services, and *Stocking* involved security services. In each case we found the situation so far from the product-oriented situation envisioned in *Moorman* that we held the *Moorman* doctrine inapplicable. *See, e.g., Continental,* 603 F.Supp. at 774 (case had "nothing to do with the sale or use of defective products").

### Application of Post-Moorman Decisions to This Case

■ From these cases a few salient considerations emerge. The fundamental principle underlying *Moorman* is that if a plaintiff has recourse to a comprehensive contract or warranty remedial scheme, his remedy should like exclusively in that scheme. *See Stocking,* Memorandum op. at 8; *Continental,* 603 F.Supp. at 744; *Moorman,* 91 Ill.2d at 88, 61 Ill.Dec. 454, 455, 435 N.E.2d at 451, 452. There is such a scheme for goods: the UCC. After *Moorman,* the Illinois Supreme Court extended the doctrine to non-UCC constructions situations, apparently finding that the contractual remedies available there are sufficiently comprehensive (although *Rosos Litho* found simple contract remedies without warranty remedies insufficient). *Ferentchak* and *Intamin* support examination of this factor in determining whether to permit suit: if a plaintiff has a remedy in contract, he should not be able to sue in tort. In the instant case, this factor militates against a tort remedy. Plaintiff has a contractual remedy against at least HBE, and plaintiff asserts that it hired the de-

fendants as one cohesive group, with each liable under the contract.

A factor related to this first "alternate remedy" factor is the nature of the plaintiff's relationship with the defendant professional. If the professional was hired by a third party, not the plaintiff, then *Bates* militates against a tort remedy. Here, plaintiff alleges that the defendant architects were hired by HBE, not by the plaintiff. First Amended Complaint, Count I, ¶ 15.

Another aspect of this second "nature of the relationship" factor is the packaging of the defendant's services. If negligent design is only one ground of plaintiff's complaint, *Republic Steel* and *Flintkote* suggest that he should not be allowed to carve that ground out of his contract action as a separate tort action. As indicated, plaintiff here alleges that he dealt with the defendants as one cohesive group: it contracted to receive a well-designed and well-built hospital. The defendant architects were hired by HBE and their renumeration was provided for as part of the blanket agreement between plaintiff and the defendants. The defects about which plaintiff complains consist of both design and construction flaws. Therefore, as in *Republic Steel*, plaintiff appears to be trying to separate out a tort suit from his basic contract remedy. We note that this is not the typical construction arrangement. Usually, an owner contracts separately and directly with the contractor and architect. Therefore, the instant case involves even more of a "package" situation than the usual construction dispute.

Phrased differently, this packaging factor relates to the professional service's relationship to a product. The court in *Flintkote* states that a tort remedy would be especially inappropriate when the designer's work was product related. In our previous opinions, we noted how the services complained about were not product related (banking and security). While a hospital building is not a product in the same sense as is a UCC good, the Illinois Supreme Court made clear in *Redarowicz* and

*Foxcroft* that buildings were to be treated as products for *Moorman* purposes. The defendants' design work here focused on production of a building, just as the designer in *Moorman* focused on production of a tank. Therefore, since the plaintiff's expectations here focused on a final product, as opposed to a pure service, such as a doctor or lawyer's function, its remedies should also be product-oriented and thus lie in the contract or warranty area.

In *Rosos Litho*, the court allowed suit in tort basically because it equated an architect-engineer with other professionals, such as doctors and lawyers. Aside from the production of a high-quality final product, the court stated that purchasers of architects' or engineers' services also expect a standard professional performance: that is the reason malpractice suits were first allowed against architects and engineers. Like a lawyer or doctor, an engineer or architect is a member of a profession in which certain standards of performance are expected as a matter of course. Therefore, the court reasoned, the professional owes a duty separate from the duty expressly contracted for by the purchaser.

Like the economic loss issue, it is easy to decide the extreme cases. For example, if a typewriter breaks and damages nothing else, it is clearly economic loss; if a roller coaster car flies off its track, killing dozens and smashing buildings, it is not solely economic loss. Here, if a manufacturer of a tank is sued for faulty design of the tank, *Moorman* clearly bars tort liability for the tank manufacturer. If a doctor misdiagnoses a patient, he clearly may be sued in tort. The question here, therefore, is whether an architect is more like a tank manufacturer (or contractor) than like a doctor, and if so, why. In *Rosos Litho*, the court found an architect or engineer more like the doctor; based on the other cases cited above, we find him more like the tank manufacturer or contractor.

This is because of the last factor discussed, *supra* at 1503, the service's relationship to a product. If an architect or engineer's work is flawed, the harm will

manifest itself in the final product. Therefore, the reasoning used by the Court in *Moorman* would also apply to an architect's or engineer's services: the parties contract to compensate for any flaws in the product caused by the service. *See East River,* —— U.S. at ——, 106 S.Ct. at 2302–04.

█ Therefore, we hold that if a plaintiff has an adequate contract or warranty remedy against a professional, and the professional's services are product oriented, he cannot sue the professional in tort. Architects' and engineers' services are product oriented. This is especially true in the instant case, where the architects' design services are inextricably entwined with the builder's construction services, that is, the plaintiff owner contracted with the builder and architect as one entity. In such cases, extracting the architect's services from the final product would be a particularly artificial distinction.

Therefore, judgment on the pleadings is granted in defendants' favor as to Count III of plaintiff's first amended complaint.

**Counts I and II: Statutes of Limitations**

Defendants argue that Ill.Rev.Stat. ch. 110, ¶ 13–214 applies to all of plaintiff's claims, and bars suit based on the defects plaintiff discovered more than two years prior to filing its original complaint. Alternatively, plaintiff argues that some of the defects claims are barred by a five year statute of limitations and that ¶ 13–214 applies to the other defect claims. In response, plaintiff argues that ¶ 13–214 does not apply to any of its claims, and even if it does apply to a few defects, these defects were not discovered until considerably later than the time defendants assert.

█ Paragraph 13–214 is a special statute of limitations for tort or contract actions arising out of the design, planning or construction of buildings. A plaintiff basically must sue within two years from the time he knew or reasonably should have known of the defendant's act or omission. Prior to passage of ¶ 13–214, construction cases were governed by Illinois' ten-year period for actions premised on written contracts (Ill.Rev.Stat. 110, ¶ 13–206), five-year period for oral or implied contracts, and five-year period for negligent damage to property (¶ 13–205). *See Chicago Heights,* 782 F.2d at 725.

Paragraph 13–214 was enacted on November 29, 1979, and had a savings clause which gave the new limitations period prospective application only. On September 16, 1981, the statute was re-enacted without the savings clause. The original complaint in this case was filed on April 7, 1980, before the savings clause was eliminated, and, therefore, any claim made in the original complaint is not governed by ¶ 13–214.[2]

█ Defendants argue that two defects in the hospital alleged in the first amended complaint (filed on January 11, 1983) were not included in the original complaint and do not relate back pursuant to Fed.R.Civ.P. 15(c) (choice of electricity over natural gas as the hospital's source of fuel, and inappropriate glass in the windows of the psychiatric ward). Therefore, they contend that at least these two claims are governed and barred by ¶ 13–214. In the first amended complaint, as in the original complaint, plaintiff alleges negligent design and construction of the hospital building. In both complaints, plaintiff enumerates specific defects in the building. *See* Reply Brief in Support of Defendants' Motion to Dismiss and for Partial Summary Judgment at 10.

A claim relates back to the original pleading if it arises out of the same "conduct, transaction, or occurrence" set forth in the original complaint. Fed.R.Civ.P. 15(c). If both complaints are based on the same general set of facts, and the later complaint is merely more specific as to those facts, then the later complaint's

**2.** Defendants' reference to *Champaign City Nursing Home v. Petry Roofing, Inc.,* 117 Ill. App.3d 76, 72 Ill.Dec. 594, 452 N.E.2d 847 (4th Dist.1983) is of no aid to them, because *Champaign* dealt with a complaint filed *after* ¶ 13–214 was re-enacted without the savings clause.

claims relate back. *See* J. Moore, 3 Moore's Federal Practice § 15.15[3] at 15–150 (2d ed.1985). For example, if the original complaint generally claims negligence, and is later amended to explain how the defendant was negligent, the amended complaint relates back. *Id.* at 15–153.

In the original complaint here, plaintiff alleged negligent design and construction of the hospital, and, therefore, defendants were adequately apprised that their acts relating to design and construction were at issue in the action. While the original complaint did not specifically allege defective choice of the hospital's source of fuel, it did complain generally about the excessive operation costs of the hospital's heating and air conditioning system. Complaint, ¶ 5(c). While no mention was made of the windows, we believe the plaintiff's general negligence claim in the original complaint still constituted adequate notice. In a Pennsylvania district court case, a plaintiff alleged in his original complaint that he was injured when scalding water emerged from the defendant's hotel shower, causing the plaintiff to twist his back in his attempt to reach safety. *Carroll v. Sterling Hotel Co.*, 16 F.R.D. 99 (M.D.Pa.1954). The plaintiff later amended the complaint to allege that while trying to reach safety, he slipped on a piece of soap negligently left on the bottom of the bath tub by defendant's employees. The court ruled that the soap allegation related back because the cause of action remained the same: in both complaints, the plaintiff was suing for injuries sustained due to the defendant's negligence. *Id.* at 100. We find *Carroll* indistinguishable from this case and agree with its reasoning. We find, therefore, that all of plaintiff's claims are governed by pre-¶ 13–214 limitation periods.

Since judgment as to Count III, based on negligence, has been granted in favor of defendants, this leaves plaintiff's contract claims. Some portions of the claims are based on a written contract; therefore, the ten-year statute applies to these claims, and it is without dispute that the original complaint was timely filed as to these claims. Those portions of the complaint based on an implied or oral contract are governed by the five-year statute. Defendants argue that these claims are barred because plaintiff discovered the defects prior to April 7, 1975. In response, plaintiff argues that the time of discovery is irrelevant (and debatable): the contract causes of action did not accrue until December 28, 1975, when plaintiff first occupied the hospital.

A contract cause of action accrues when a plaintiff breaches the contract, that is, when he does not perform on the date promised in the contract. *See Kozasa v. Guardian Electric Manufacturing Co.*, 99 Ill.App.3d 669, 54 Ill.Dec. 920, 425 N.E.2d 1137 (1st Dist.1981). Similarly, if we apply an accrual date analogous to the UCC's date for implied warranties to plaintiff's implied contract claim, the date is not the date of discovery of the defect, but rather date of the delivery of the item for which the plaintiff contracted. *See* Ill.Rev.Stat. ch. 26, ¶ 2–725. Here, defendants allegedly promised to deliver a hospital free of defects. The hospital was delivered at the earliest on December 28, 1975. Therefore, plaintiff's cause of action did not accrue until at least that date, and its action is timely.

Defendants argue that the hospital's design was completed prior to November 1973, and, therefore, that should constitute the proper accrual date for plaintiff's design claims. But components of a contract cannot be wrenched out of the contract for accrual purposes, especially in construction cases. *See Santucci Construction Co. v. City of Danville*, 128 Ill.App.3d 954, 84 Ill.Dec. 234, 471 N.E.2d 1000 (4th Dist. 1984). Plaintiff alleges one unified agreement to design and build a hospital free of defects. The whole contract was not breached until delivery of the hospital, not delivery of the design.

## CONCLUSION

Since no genuine issue of material fact exists as to whether the statutes of limitations bar any of plaintiff's claims, summary judgment is granted to plaintiff on this

issue. *See* C. Wright, A. Miller and M. Kane, 10 *Federal Practice and Procedure* at § 2720, pp. 29–30 (1983) (summary judgment may be granted opposing party although no formal cross-motion filed).

For the reasons given above, judgment on the pleadings is granted in favor of defendants as to Count III of plaintiff's first amended complaint. Defendants' motion for partial summary judgment as to Counts I and II is denied, and summary judgment is granted to plaintiff on the issue of whether any of its claims are barred by the statutes of limitations.